## Shrum v. Meredith.

### (Decided May 14, 1935.)

BRATCHER & MOORE for appellant.

HUBERT MEREDITH for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

On January 19, 1925, C. T. Walters executed his promissory note to C. Gabbard for $1,050, due one year from date and bearing 6 per cent. interest until paid, and secured same by mortgage of even date on live stock and farming implements. Gabbard indorsed and transferred the note and mortgage to the appellant, J. P. Shrum. At the time the note and mortgage was executed, and at the time of the transfer to Shrum, Walters was the owner of a farm near Rochester, Ky. It appears that Walters owed considerable indebtedness, and his farm was covered by mortgage. Gabbard and one Simmons were the tenants of Walters and in charge of the farm.

Some time within the year 1925, Walters left the state and went to Birmingham, Ala., leaving the farm in charge of his tenants, Gabbard and Simmons. Appellee, Hubert Meredith, who was a brother-in-law of Walters, was accommodation indorser for Walters on a considerable amount of paper, on which Walters had defaulted. In order to protect himself as indorser, Meredith assumed payment of the mortgages and perhaps other indebtedness of Walters, whereupon Walters conveyed the farm to Meredith. It appears that Gabbard remained in charge of the farm, thus becoming a tenant of Meredith.

The mortgaged personal property which included live stock, etc., were yet on the farm, and it appears that Meredith and his tenant, Gabbard, had the responsibility of pasturing, looking after and caring for the live stock and other mortgaged property. Meredith, becoming desirous to rid himself of the annoyance and responsibility of the mortgaged property, proceeded to advertise same for sale at public outcry. This sale was had on December 19, 1925. There is a conflict between Meredith and Shrum as to whether Shrum consented to the property being advertised for sale. Shrum con-

tends that he did not consent to the property being advertised for sale, while Meredith contends that the arrangements for the sale was a mutual affair between himself and Shrum. However, on the day of the sale, Shrum appeared and objected to the sale or at least made it known to Meredith that he held the mortgage on certain of the personal property and objected to the sale thereof unless satisfactory arrangements could be made with respect to the payment of his note. Shrum alleges in his petition, and so testifies in his deposition, that when he objected to the sale, Meredith promised him that if he would consent to the sale he would see that his note was taken care of out of the proceeds of the sale, and, relying upon this understanding and agreement with Meredith, he withdrew his objections and they proceeded with the sale. Shrum says that after the sale was over he endeavored to find Meredith to effect a settlement of his note pursuant to the alleged agreement, but learned that Meredith had become ill and had gone home. The sale included other personal property of Walters not covered by the mortgage, and the total proceeds of the sale approximated $2,400, practically one-half of which sum being the proceeds of the mortgaged property.

It is the contention of appellant, Shrum, that Meredith is responsible to him for the entire sum of the note, with interest, which at that time amounted to $1,107.75. He bases this alleged liability upon the alleged agreement of Meredith that he would see that the note was taken care of out of the proceeds of the sale of the personal property in consideration of Shrum's consent that the sale be had.

It appears that soon after the sale, Shrum became very active in trying to effect a settlement with Meredith and Gabbard, but was unable to do so. After many conversations and some correspondence with Meredith between date of the sale and November 12, 1929, and being unable to obtain a settlement, Shrum filed this suit against Gabbard and Meredith seeking to recover against them on the note. In his petition he alleged the agreement with Meredith and other facts substantially as above set out.

Meredith filed his separate answer denying that he agreed to assume payment of the note, or personally

obligate himself to see that it was paid in consideration of Shrum's consent to the sale. He alleges that the sale was a mutual affair between him and Shrum. Meredith admits, however, that upon arriving upon the grounds to conduct the sale, Mr. Shrum advised him that he had a mortgage on some of the property and that he objected to the sale, whereupon Meredith told Shrum to take the mortgaged property off his farm and do what he pleased with it, and Shrum declined to do so; that it was then suggested that they proceed with the sale and that enough of the notes and proceeds of the sale of the mortgaged property be turned over to Shrum to liquidate his indebtedness, and under this agreement they proceed with the sale. But Meredith alleges a later agreement, in effect that, during the progress of the sale Gabbard was bidding in nearly everything that was sold and he, Meredith, felt that Gabbard could not pay for it and he called Shrum to one side and told him that "it looked like Gabbard was going to purchase all of the stuff and that I didn't think he could pay for it or secure its payment and suggested that he stop the sale, and that Shrum take the mortgaged property," but Shrum declined to do so and told Meredith that he would arrange the matter with Gabbard and that Gabbard would settle with him by executing him a new note and mortgage upon the property which he purchased. He says that Gabbard also conveyed the same idea to him some time during the day, indicating that he had made that arrangement with Shrum, and that he told Gabbard of his conversation with Shrum and Gabbard said that it was alright and that he and Shrum had an understanding about the matter.

It is apparent from the evidence that the conversation had between Shrum and Meredith just previous to the sale was sufficient to lead Shrum to believe that Meredith would see that his note was taken care of. Shrum is corroborated by Gabbard, who also testified that Meredith was to see that the note was paid out of the funds of the proceeds of the sale. But if it be conceded that Meredith was bound to Shrum on the first alleged agreement, if a second agreement was had, which was in effect that, when Meredith conceived the idea that Gabbard was purchasing more of the property at the sale than he would be able to pay for, and he told Shrum that Gabbard may not be able to pay for it and

suggested that the sale be stopped and the mortgaged property turned over to Shrum, and Shrum suggested that they go ahead with the sale and that he, Shrum, had an agreement with Gabbard to take care of the note by executing a note for the property he purchased together with mortgages on same to secure it, and pursuant to this later agreement they proceeded with the sale. If this agreement was made it abrogated the former agreement, and this controversy turns upon whether or not the last alleged agreement was made. Shrum and Gabbard both deny this agreement, but Meredith testifies positively that such agreement was had. In course of the negotiations between Shrum and Meredith for settlement of the note, some correspondence was had between them. One of the letters Meredith wrote Gabbard, in part reads as follows:

> "When the property of C. T. Walters was sold you purchased a lot of mules and stuff upon which J. H. Shrum had a mortgage. I did not take your note for that part of the stuff for the reason that you told me that you had arranged to settle this matter direct with Shrum."

In the remainder of the letter he insisted on Gabbard making settlement with Shrum. In another letter along the same line, Meredith told Gabbard that unless Shrum's note was satisfied Shrum would sue them both "and make a lot of trouble for us." Meredith explains this statement in the letter by stating that he did not mean to admit that he was personally liable to Shrum, but used that language as a means of trying to persuade Gabbard to settle with Shrum; that Gabbard was his tenant and they were close friends and he had done Gabbard many favors which he thought Gabbard would appreciate, and that he thought that this letter might be some inducement to Gabbard to take care of the obligation and thereby protect him, Meredith, from the annoyance and embarrassment of a suit.

Gabbard admits that he purchased $800 worth of the mortgaged property for which he later executed his note payable to Meredith and delivered to Claude King, bookkeeper at the sale, but he did not know what became of it. He admits that he had not paid the note. Meredith says that the note never had come into his possession and he did not know that such note had been

executed until after this suit had been filed. Meredith admits that he purchased some of the mortgaged property, but that part of it belonged to Mrs. Walters, his sister. He further says that there was more than $200 county and state taxes due against Walters' property, which included the mortgaged property, and he paid the taxes out of the proceeds of the property he purchased, and in addition thereto he paid about $230 of his own money. However, in the circumstances, it appears that only a small part of these taxes was against the mortgaged property.

Upon the evidence as above indicated, the chancellor rendered judgment against Gabbard, but dismissed the petition as against the appellee, Meredith. It is the well-established rule that when the evidence is so conflicting as to leave reasonable minds in doubt this court will not disturb a finding of fact by a chancellor. Boggess v. Crail, 224 Ky. 97, 5 S. W. (2d) 906; Allensworth v. Allensworth's Ex'r, 239 Ky. 43, 39 S. W. (2d) 198. 203. In the Allensworth Case, supra, it is said:

"There is always a presumption in favor of the finding of the chancellor which an appellant must overcome."

Inasmuch as the chancellor was controlled by the evidence produced in behalf of appellee, Meredith, we do not think that the presumption in favor of the correctness of the chancellor's finding has been overcome by the appellant.

After the case had been submitted, the court permitted Meredith to file an amended answer, which was in substance a plea of laches on the part of Shrum, in that he failed to use due diligence in collecting his claim out of the mortgaged property. As we have stated, the sale was had on December 19, 1925, and it appears the mortgaged property purchased by Gabbard, or a large portion thereof, remained in the neighborhood and community, and Shrum made no efforts to seize on the property or to otherwise avail himself of the benefits thereof, but merely corresponded and argued with the parties about a settlement of his note. The amended answer was filed over the objections of Shrum and controverted of record. It is insisted for appellant that it was an abuse of discretion to permit the amended answer filed at the time it was filed and merely contro-

verted of record, but without giving appellant an opportunity to produce evidence on the issue it raised. But since we have concluded that the evidence with respect to the alleged agreement between appellant and appellee was sufficient to sustain the chancellor, it is immaterial whether the filing of the amended answer was proper or improper. The judgment does not state upon what ground the chancellor dismissed the petition as against Meredith; but when the judgment of the trial court is proper upon any theory manifested by the record, such judgment will be sustained by this court even though the trial court based his conclusion upon an erroneous reason or theory. Anderson v. City of Ludlow, 250 Ky. 204, 62 S. W. (2d) 785, and cases cited therein.

The judgment is affirmed.